EC/JMR

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*
The Telegram account @just3956 associated to phone number 740-343-3632 located on a Samsung Galaxy Note 20 Ultra with IMEI 356556770559871 belonging to Justin Robert Lyons

)
)
)
)
)
)

Case No. 2:25·mj·113 (APP)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, incorporated herein by reference

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251 | Sexual Exploitation of a Minor |
| 18 U.S.C. §§ 2252, 2252A | Distribution, Receipt, and/or Possession of Child Pornography |

The application is based on these facts:

See attached affidavit incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Digitally signed by
SALTAR.JOSH.A13U65E39
Date: 2025.03.03 10:02:55 -05'00'

_____
*Applicant's signature*

FBI SA Josh Saltar
*Printed name and title*

Sworn to before me and signed in my presence.

Date: VIA VOICE Audio 3/3/2025

_____
*Judge's signature*

City and state: Columbus, Ohio

Elizabeth Preston Deavers, U.S. Magistrate Judge
*Printed name and title*

| | | |
|---|---|---|
| In the Matter of the Search of: | ) | No. 2:25·mj·113 |
| | ) | |
| The Telegram account @just3956 associated to phone | ) | |
| number 740-343-3632 located on a Samsung Galaxy | ) | Magistrate Judge: |
| Note 20 Ultra with IMEI 356556770559871 belonging to | ) | |
| Justin Robert Lyons | ) | <u>UNDER SEAL</u> |

## <u>AFFIDAVIT IN SUPPORT OF</u>
## <u>AN APPLICATION FOR A SEARCH WARRANT</u>

I, Josh Saltar (Your Affiant), a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, hereby depose and state:

### <u>EDUCATION TRAINING AND EXPERIENCE</u>

1. I am a Special Agent (SA) with the FBI and have been since October 2014. I am currently assigned to the Child Exploitation and Human Trafficking Task Force, Cincinnati Division, Columbus Resident Agency. Additionally, I am a Task Force Agent with the Central Ohio Human Trafficking Task Force. I am primarily responsible for investigating internet crimes against children, including child pornography offenses and the online exploitation of children, as well as the sex trafficking of children.

2. During my career as a SA, I have participated in various investigations involving computer-related offenses and have executed numerous search warrants, including those involving searches and seizures of computers, digital media, software, and electronically stored information. I have worked with multiple international law enforcement agencies around the world, focusing on cyber-terrorism and terrorist financing through computer intrusions. I have also assisted on various cases and violations, ranging from violent crimes against children and white collar to healthcare fraud, counterintelligence, and counterterrorism. As part of my duties as a Special Agent, I investigate criminal violations relating to child exploitation and child pornography violations, including the illegal production, distribution, transmission, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2252, and 2252A. I

have reviewed numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media.

3. Prior to joining the FBI, I spent four years working as a civilian Intelligence Specialist for the U.S. Air Force at the National Air and Space Intelligence Center located at the Wright-Patterson Air Force Base, under both the cyber and counterspace squadrons, performing classified intel and reverse engineering duties. During my employment, I have received numerous forensic trainings with the both the Department of Defense and Department of Justice, as well as from private sector security conferences. I have received multiple certifications in Windows, mobile, and memory forensics, as well as incident response and penetration testing, and am certified by the Department of Justice as a Digital Extraction Technician. I received my B.A. from Anderson University in computer science, with a focus on programming, artificial intelligence, and machine learning.

4. As a SA with the FBI, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

## PURPOSE OF THE AFFDAVIT

5. This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the accounts specifically described in **Attachment A** of this Affidavit. The facts and statements set forth in this affidavit are based on my knowledge, experience, and investigation, as well as the knowledge, experience, and investigative findings of others with whom I have had communications about this investigation, including other law enforcement officers and agents. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts I believe are necessary to establish probable cause for a search warrant for the Telegram account @just3956 (the **SUBJECT ACCOUNT**) associated to phone number 740-343-3632, located on a Samsung Galaxy Note 20 Ultra with IMEI 356556770559871 belonging to Justin Robert LYONS. I have not omitted any facts that would negate probable cause.

6. The **SUBJECT ACCOUNT** to be searched is more particularly described in **Attachment A** for the items specified in **Attachment B,** which items constitute instrumentalities, fruits, and evidence of violations of 18 U.S.C. §§ 2251, 2252, and 2252A – sexual exploitation of a minor, advertising/solicitation for/or, and distribution and receipt of visual depictions of minors

engaged in sexually explicit conduct (hereinafter "child pornography"), distribution, transmission, receipt, and/or possession of child pornography. I am requesting authority to search the **SUBJECT ACCOUNT**, wherein the items specified in **Attachment B**, and to seize all items listed in **Attachment B** as evidence, fruits, and instrumentalities of the above violations.

## APPLICABLE STATUTES AND DEFINITIONS

7. Title 18 United States Code, Section 2251(a) makes it a federal crime for any person to employ, use, persuade, induce, entice, or coerce any minor to engage in, or have a minor assist any other person to engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, if such person knows or has reason to know that either the visual depiction will be transported or transmitted via a facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, or that the visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce, or if the visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce. Subsection (e) of this provision further prohibits conspiracies or attempts to engage in such acts.

8. Title 18 United States Code, Section 2251(d)(1)(A) makes it a federal crime for any person to make, print, publish, or cause to be made, printed or published, any notice or advertisement that seeks or offers to receive, exchange, buy, produce, display, distribute or reproduce, any visual depiction involving the use of a minor engaging in sexually explicit conduct, if such person knows or has reason to know that either the notice or advertisement will be transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mail; or that the notice or advertisement actually was transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mail.

9. Title 18, United States Code, Section 2252, makes it a federal crime for any person to knowingly transport, receive, distribute, possess or access with intent to view any visual depiction of a minor engaging in sexually explicit conduct, if such receipt, distribution or possession utilized a means or facility of interstate commerce, or if such visual depiction has been mailed, shipped or transported in or affecting interstate or foreign commerce. This

section also prohibits reproduction for distribution of any visual depiction of a minor engaging in sexually explicit conduct, if such reproduction utilizes any means or facility of interstate or foreign commerce or is in or affecting interstate commerce.

10. Title 18, United States Code, Section 2252A, makes it a federal crime for any person to knowingly transport, receive or distribute any child pornography using any means or facility of interstate commerce, or any child pornography that has been mailed, or any child pornography that has shipped or transported in or affecting interstate or foreign commerce by any means, including by computer. This section also makes it a federal crime to possess or access with intent to view any material that contains an image of child pornography that has been mailed, shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate commerce by any means, including by computer.

11. As it is used in 18 U.S.C. §§ 2251 and 2252, the term "sexually explicit conduct" is defined in 18 U.S.C. § 2256(2)(A) as actual or simulated: sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic area of any person.

12. As it is used in 18 U.S.C. § 2252A(a)(2), the term "child pornography"[1] is defined in 18 U.S.C. § 2256(8) as: any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where: (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

13. The term "sexually explicit conduct" has the same meaning in § 2252A as in § 2252, except that for the definition of child pornography contained in § 2256(8)(B), "sexually explicit conduct" also has the meaning contained in § 2256(2)(B): (a) graphic sexual intercourse,

---

[1] The term child pornography is used throughout this affidavit. All references to this term in this affidavit and Attachments A and B hereto, include both visual depictions of minors engaged in sexually explicit conduct as referenced in 18 U.S.C. §§ 2251 and 2252 and child pornography as defined in 18 U.S.C. § 2256(8).

including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of any person is exhibited; (b) graphic or lascivious simulated (i) bestiality, (ii) masturbation, or (iii) sadistic or masochistic abuse; or (c) graphic or simulated lascivious exhibition of the genitals or pubic area of any person.

14. The term "minor," as used herein, is defined pursuant to Title 18, United States Code, Section 2256(1) as "any person under the age of eighteen years."

15. The term "graphic," as used in the definition of sexually explicit conduct contained in 18 U.S.C. § 2256(2)(B), is defined pursuant to 18 U.S.C. § 2256(10) to mean "that a viewer can observe any part of the genitals or pubic area of any depicted person or animal during any part of the time that the sexually explicit conduct is being depicted."

16. The term "visual depiction," as used herein, is defined pursuant to T18 U.S.C. § 2256(5) to "include undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image."

17. The term "computer" is defined in 18 U.S.C. § 1030(e)(1) as an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

18. The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

19. "Cellular telephone" or "cell phone" means a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of

transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving videos; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may include geographic information indicating where the cell phone was at particular times.

20. Internet Service Providers" (ISPs), used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

21. "Internet Protocol address" (IP address), as used herein, is a code made up of numbers separated by dots that identifies particular computer on the Internet. Every computer requires an IP address to connect to the Internet. IP addresses can be dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

22. As it is used throughout this affidavit and all attachments hereto, the term "storage media" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## BACKGROUND REGARDING THE INTERNET AND MOBILE APPLICATIONS

23. I know from my training and experience that computer hardware, mobile computing devices, computer software, and electronic files ("objects") may be important to criminal investigations in two distinct ways: (1) the objects themselves may be evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer

hardware, software, and electronic files that are evidence of a crime, contraband, and instrumentalities and/or fruits of crime.

24. Computers, mobile devices and the Internet have revolutionized the ways in which those with a sexual interest in children interact with each other and with children they seek to exploit. These new technologies have provided ever-changing methods for exchanging child pornography and communicating with minors. Digital technology and the Internet serve four functions in connection with child pornography and child exploitation: production, communication, distribution, and storage.

25. Computers, tablets and smart/cellular phones ("digital devices") are capable of storing and displaying photographs. The creation of computerized or digital photographs can be accomplished with several methods, including using a "scanner," which is an optical device that can digitize a photograph. Another method is to simply take a photograph using a digital camera or cellular phone with an onboard digital camera, which is very similar to a regular camera except that it captures the image in a computerized format instead of onto film. Such computerized photograph files, or image files, can be known by several file names including "GIF" (Graphic Interchange Format) files, or "JPG/JPEG" (Joint Photographic Experts Group) files.

26. Digital devices are also capable of storing and displaying movies of varying lengths. The creation of digital movies can be accomplished with several methods, including using a digital video camera (which is very similar to a regular video camera except that it captures the image in a digital format which can be transferred onto the computer). Such computerized movie files, or video files, can be known by several file names including "MPG/MPEG" (Moving Pictures Experts Group) files.

27. The capability of digital devices to store images in digital form makes them an ideal repository for child pornography. A single CD, DVD, or USB thumb drive can store hundreds or thousands of image files and videos. It is not unusual to come across USB thumb drives that are as large as 128GB. The size of hard drives and other storage media that are used in home computers and cellular phones have grown tremendously within the last several years. Hard drives with the capacity of several terabytes are not uncommon. These drives can store hundreds of thousands of images and videos at very high resolution. Tablet devices have average storage capabilities ranging from 16 Gigabytes to 256 Gigabytes. In addition, most

tablets have the ability to utilize the various drives (thumb, jump or flash) described above, which can allow a user to access up to an additional 256 Gigabytes of stored data via the tablet. Modern cell phones have average storage capabilities ranging from 32 Gigabytes to 256 Gigabytes. In addition, most cellular phones have the ability to utilize micro SD cards, which can add up to an additional 128 Gigabytes of storage. Media storage devices and cellular phones can easily be concealed and carried on an individual's person. Mobile computing devices, like cellular phones and tablets, also have the ability to take still and moving images that are easily stored, manipulated or transferred between devices using software or applications installed on each device. Additionally, multiple devices can be synced to a single account and when an image or video file is transferred it can be transferred to devices synced to the account at the same time. As a result of this technology, it is relatively inexpensive and technically easy to produce, store and distribute child pornography. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and to save that image by storing it in another country. Once this is done, there is no readily apparent evidence at the scene of the crime. Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

28. The Internet is a worldwide network of computer systems operated by governmental entities, corporations, and universities. With a computer or mobile device connected to the Internet, an individual user can make electronic contact with millions of other computer or mobile device users around the world. Many individual computer/mobile device users and businesses obtain their access to the Internet through businesses known as Internet Service Providers ("ISPs"). ISPs provide their customers with access to the Internet using wired telecommunications lines, wireless signals commonly known as Wi-Fi, and/or cellular service; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers or cellular network; remotely store electronic files on their customers' behalf; and may provide other services unique to each particular ISP. ISPs maintain records pertaining to the individuals or companies that have subscriber accounts with the ISP. Those records may include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information,

account application information, Internet Protocol ("IP") addresses and other information both in computer data format and in written record format.

29. These internet-based communication structures are ideal for those seeking to find others who share a sexual interest in children and child pornography, or seeking to exploit children online. Having both open as well as anonymous communication capability allows the user to locate others of similar inclination and still maintain their anonymity. Once contact has been established, it is then possible to send messages and graphic images to other trusted child pornography collectors or to vulnerable children who may not be aware of the user's true identity. Moreover, the child pornography collector need not use large service providers. Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other or with children, and to exchange child pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired.

30. It is often possible to recover digital or electronic files, or remnants of such files, months or sometimes even years after they have been downloaded onto a hard drive or other digital device, deleted, or viewed via the Internet. Such files can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or even years later using readily available forensic tools. When a person "deletes" a file from a digital device, the data contained in the files does not actually disappear; rather the data remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, space on a storage medium that is not allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

31. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

32. As is the case with most digital technology, communications by way of computer or mobile devices can be saved or stored on the computer or mobile device used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or mobile device, or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places, such as temporary files or ISP client software, among others. In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

33. Searching computer systems and electronic storage devices may require a range of data analysis techniques. Criminals can mislabel or hide files and directories, encode communications, attempt to delete files to evade detection, or take other steps to frustrate law enforcement searches. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in **Attachment B**.

34. A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications. Mobile applications, also referred to as "apps," are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game. Examples of such "apps" include KIK messenger service, Telegram, Snapchat, X (formerly known as Twitter), and Instagram.

### BACKGROUND INFORMATION REGARDING TELEGRAM

35. Telegram Messenger (also known as "Telegram") is a cloud-based mobile and desktop messaging application purportedly owned and/or controlled by Telegram Messenger Inc. Telegram can be used on smartphones, such as Apple iOS and Google Android devices, and on desktop computers, by users to send messages and media to each other.

36. Telegram was founded in 2013 in Russia, but, according to its website, it purportedly "has tried a number of locations as its base," and currently its "development team is based in Dubai."[2]

---

[2] https://telegram.org/faq (last visited February 19, 2025)

37. To sign up for a Telegram account, a user must provide a phone number. Telegram users can also select a username but are not required to. Usernames are unique, meaning only one user can have a particular username. Users can also select a display name, such as a first and last name. Display names are not unique.

38. Telegram is supported on various devices including smartphones, tablets, desktop computers and laptop computers, and Telegram can by synced on multiple devices at the same time. A user can log into Telegram using a phone number from as many devices as that user likes, even simultaneously. Unless a user enables a "lock" on the Telegram application, which may include two-factor authentication, anyone who gains access to an unlocked smartphone, tablet, or computer running Telegram will be able to access and view a user's Telegram account.

39. Telegram offers a variety of communication methods for its users:

    - Chats - Users on Telegram can communicate with each other through chats. They can send each other text messages, photos, videos, any files, and make voice calls.

    - Secret Chats - Secret chats use end-to-end encryption, which means only the sender and recipient have the ability to view the content of the chats. These secret chats also disappear and can be set to self-destruct.

    - Groups - Telegram allows collections of users to communicate with each other in chat rooms called groups. Groups may be by invitation only.

    - Channels – A channel is generally run by an administrator and is able to publicly post or broadcast information to an unlimited number of users subscribed to the channel.

40. According to Telegram's privacy policies, Telegram stores basic user account data, including mobile number, profile name, profile picture, screen names, and e-mail address, to the extent a user has provided this information. Telegram also stores messages, photos, videos and documents from a user's cloud chats and private messages, as well as from public channels and public groups in which the user participates. However, the data is stored heavily encrypted. According to Telegram, "This means that the file is technically on one of Telegram's servers, but it looks like a piece of random indecipherable garbage to everyone except for you and the recipient."[3]

---

[3] https://telegram.org/privacy (last visited February 19, 2025)

41. Telegram advertises that it provides server-client encryption for private and group chats, and optional client-client encryption for chats and video calling.[4] Some Telegram users likely use its services to address legitimate concerns to keep online information private. However, in my training and experience, Telegram is known to law enforcement as a tool used by some individuals for the purpose of discussing or even furthering criminal activity because those individuals believe that their communications are untraceable due to the application's encryption option. In my training and experience with investigating child exploitation cases and from speaking with other law enforcement agents, I am aware that some individuals who traffic in child sexual abuse material use Telegram because they believe their communications are untraceable due to Telegram's encryption.

42. Additionally, Telegram uses distributed infrastructure to protect data that is not covered by end-to-end encryption. Telegram states:

> To protect the data that is not covered by end-to-end encryption, Telegram uses a distributed infrastructure. Cloud chat data is stored in multiple data centers around the globe that are controlled by different legal entities spread across different jurisdictions. The relevant decryption keys are split into parts and are never kept in the same place as the data they protect. As a result, several court orders from different jurisdictions are required to force us to give up any data.
>
> Thanks to this structure, we can ensure that no single government or block of like-minded countries can intrude on people's privacy and freedom of expression. Telegram can be forced to give up data only if an issue is grave and universal enough to pass the scrutiny of several different legal systems around the world.
>
> To this day, we have disclosed 0 bytes of user messages to third parties, including governments.[5]

43. Ultimately, in my training and experience, Telegram's business model is designed to conceal information related to customer accounts in the United States and elsewhere through technological means. Telegram's founder and CEO, Pavel Durov tweeted, "We've no issue

---

[4] https://telegram.org/faq#q-so-how-do-you-encrypt-data (last visited February 19, 2025)
[5] https://telegram.org/faq#q-do-you-process-data-requests (last visited February 19, 2025)

with formalities, but not a single byte of private data will ever be shared with any government."[6]

44. Based on my training and experience, information provided by other agents, and Telegram's own description of its services, Telegram is supported on various devices including smartphones, tablets, desktop computers and laptop computers, and Telegram can by synced on multiple devices at the same time. Although Telegram provides the options of (1) 2-step verification for logging in; and/or (2) requiring a passcode before a Telegram user's account can be accessed, typically once a user logs into a Telegram from a device (like a smartphone), anyone who later possess that same device can access a user's Telegram account from that device, without a password or other verification, unless the user logged out of Telegram the last time the user used Telegram from any device. Typically, a Telegram user does not log out of Telegram after using it. A user (or a third party with access to a user's account on a device that was already logged on) who accesses an account can retrieve the user's previous activity on Telegram, including chats, messages in groups, etc., if the user did not previously delete it or Telegram did not automatically delete it.[7]

## INVESTIGATION AND PROBABLE CAUSE

45. Leading up to Tuesday November 13, 2024, a Federal Bureau of Investigation (FBI) Special Agent (SA) was acting in an undercover capacity as an Online Covert Employee (OCE) as part of the FBI Child Exploitation Task Force, operating out of the Northern Virginia Resident Agency (NVRA). On Friday November 8, 2024, the OCE corresponded with Kik display name "skylarsdad" – username "Cribby80."

46. "Cribby80" invited the OCE to an invite only group on the social media application called Telegram. The name of the group was "dads group" and there were approximately 6-7 users within the group. The users of this group were primarily distributing age questionable material to include images and videos. Kik user "Cribby80" was Telegram user "john4954." The OCE remained in the "dads group" in Telegram and also engaged in a private Telegram chat conversation with "john4954."

47. Telegram user "john4954" claimed to be sexually active with his 14-year-old stepdaughter, ▮▮▮▮▮ On or about November 08, 2024, "john4954" sent the OCE approximately 3 videos of

[6] https://x.com/durov/status/880114461075439616?mx=2 (last visited February 19, 2025)
[7] https://telegram.org/faq#q-i-have-a-new-phone-number-what-do-i-do (last visited February 19, 2025)

what he reported to be himself and ████ having sex, however, the female's face was either not shown in the video or difficult to identify. Telegram user "john4954" then sent an image of the female laying on a bed, with her head turned to the left and her buttocks in the air. The female was wearing a "onesie" style of pajamas, with an opening to expose her buttocks. A nose piercing stud on her left nostril as well as a septum piercing were visible.

48. On November 8, 2024, FBI NVRA sent an Emergency Disclosure Request (EDR) to Kik for the username cribby80. Kik responded with the following information:
    - First Name: ████
    - Last Name: dad
    - Email: jlyons801@yahoo.com (unconfirmed)
    - Phone make: Samsung
    - IP Address: 65.60.178.131 – 11/07/2024 14:37:10 UTC
    - IP Address: 65.60.240.244 – 11/07/2024 22:04:13 UTC

49. Also on November 8, 2024, FBI NVRA sent an administrative subpoena to Telegram for the user "john4954." Telegram responded and provided the following information:
    - Phone: 740-343-3632
    - IP Address: 65.60.240.244

50. On November 9, 2024, "john4954" sent the "dads group" an image of a hand holding a black dildo up to a female's vagina. Telegram user "john4954" stated that this was from the evening prior, November 8, 2024, of him and ████ having sex while his wife was at work. Telegram user "john4954" then stated in a private message to the OCE that he did not text back the evening before because he leaves his burner phone with Telegram at his office. Telegram user "john4954" explained that he was at his office specifically to download last night's "content" so that he could remove it from his primary phone in order to hide it from his wife.

51. On November 10, 2024, "dads group" was deleted from Telegram. This same day, "john4954" deleted the conversation between himself and the OCE, however one image and one video received from "john4954" of ████ had been preserved.

52. On November 11, 2024, "john4954" sent the OCE a selfie style image while at work, with the device and half his face visible. The device appeared to be a dark colored Samsung device.

53. Also on November 11, 2024, FBI NVRA sent an EDR to Breezeline for the IP address 65.60.178.131 on 11/07/2024 14:37:10 UTC and 65.60.240.244 on 11/07/2024 22:04:13 UTC. Breezeline responded and provided the following information for both IP Addresses:

- Subscriber: Baker Welding
- Address: 2901 E 4th Ave, Ste 95, Columbus, OH 43219

54. On November 12, 2024, FBI NVRA performed open-source checks on the phone number 740-343-3632, which returned a Snapchat account with Username "justinlyons80" and display name "justin lyons."

55. On November 13, 2024, "john4954" stated "if you have any requests I can make it happen. she loves photo shoots. I can basically have her do whatever for you." Telegram user "john4954" then stated that he was taking ███ to get her septum pierced later that day, and explained that she already had her nose pierced. Approximately an hour and a half later, "john4954" messaged the OCE and stated that he took her for the piercing and sent an image of her captioned "here's the one that got me hard asf" and "she gets soaked easily." The image was of a young female in the passenger seat with a septum piercing, with her leg propped up on the driver's seat, wearing navy blue shorts with her right hand down her pants and a wet spot on the exterior of her shorts in the vaginal area. Telegram user "john4954" sent a second image which was a closer up view of her face, where you could see both the septum piercing as well as a nostril stud piercing. Both images appeared to be taken from the interior of a red Jeep Wrangler based off the side and top of the interior.

56. Also on November 13, 2024, FBI NVRA queried law enforcement databases for "Justin Lyons," and identified a Justin Robert LYONS, DOB ███ residing in New Lexington, Ohio. The DMV photo for LYONS was similar to the selfie photo that was sent to the OCE on November 11.

57. Additionally on November 13, 2024, FBI NVRA identified an adult female, JANE DOE, associated to LYONS. Upon review of JANE DOE's DMV photo, JANE DOE's physical appearance matched the physical appearance of the purported 14-year-old stepdaughter, ███. JANE DOE had both a septum piercing as well as a nostril stud piercing. JANE DOE was located on Facebook, where additional photos of her were located that matched both her driver's license picture as well as the images provided to the OCE by "john4954." Also observed on JANE DOE's Facebook page was a photo of LYONS.

58. On December 13, 2024, "john4954" and the OCE discussed a specific, invite only Telegram group that "john4954" was a member of that involved sexual exploitation of minors. Specifically, requirements to be involved in the group was to actively post original content depicting the members themselves sexually abusing a minor. The following is an excerpt of the conversation:

- John4954 – I talk to three other people besides you.
- John4954 – all have verified they have daughters
  ***
- John4954 – I'm just in that one group but it's only original content and you have to actively post.
  ***
- John4954 – guy in the group said I could share this. He was live with her on telegram yesterday.
- John4954 – just don't share it with anyone. He doesn't want it to get around too much
- John4954 – he's just trying to find new people to join the group
- [John4954 sent a 14 minute 41 second video that depicted a young pubescent girl, approximately 10-13 years old, wearing a black shirt and green pants. The girl was looking at the camera and asked several times "what do you guys want me to do" with several pauses in-between the questions. At approximately 53 seconds, the girl appeared to be reading a screen and said quietly "take off pants and…[unintelligible]….hmmm." A voice behind the camera stated, "you don't have to take it off, just pull…[unintelligible]." The girl laid down on her back and stated, "I can go like this and take it off, is that good?" to which the male voice responded, "yeah [unintelligible]." The girl then asked again "do you want me to go like this and take it off for a little?" The girl then pulled her pants to her thighs and lifted her legs up, exposing her vagina and anus. A right hand reached over to rub the girl's nude vagina. The hand had a small cross tattooed between the thumb and index finger, and a small smiley face tattooed on the index finger. At approximately 1 minute 40 seconds, the girl pulled her pants back up and asked, "is that good?" The girl continued to stare at a screen off the camera. At approximately 2 minutes 15 seconds, the girl stated, "I'll just show you guys, ok?" The girl then whispered something to

someone off the camera. At approximately 2 minutes 35 second, the girl stated, "I'll take my pants off for a couple of seconds, ok?" The girl laid back down on her back, pulled her pants to her thighs, and lifted her legs up to expose her vagina and anus. The voice behind the camera whispered something to the girl, who then began to rub her vagina. At approximately 3 minutes, the girl pulled her pants back up and asked, "is that good?" At approximately 3 minutes 51 seconds, the girl stated "I can take my pants off for a little, ok? [unintelligible]." The girl repeated the process of pulling her pants down to expose her vagina and anus and rubbed her vagina. At approximately 4 minutes 15 seconds, the girl pulled her pants back up and asked, "Is that good?" After a couple of seconds of looking off the camera, she stated "No, I don't want to do that, ok you guys?" The voice off the camera whispered something to her, and then she stated, "Ok you guys, I did some of your things, but do you want him now or still me for a little longer?" When the girl said "him now," she pointed off the camera. At approximately 7 minutes 20 seconds, the girl pulled her pants down to her knees and got on her elbows and knees facing away from the camera to expose her vagina and anus. The same right hand reached over to rub the girl's vagina. At approximately 7 minutes 40 seconds, the girl pulled her pants back up and asked, "is that good?" At approximately 9 minutes, the girl stated, "I can't do that right there, I can't" and then lifted up her shirt to expose her breasts. At approximately 10 minutes, the girl lifted up her shirt again to expose her breasts and pulled her pants down to expose her vagina. At approximately 10 minutes 25 seconds, she pulled her pants up and shirt down and asked, "that good?" At approximately 13 minutes 30 seconds, the girl stated "I can't take it all the way off. I can take off my pants for a little?" and then pulled her pants down to expose her vagina and anus and began to rub her vagina. At approximately 14 minutes 25 seconds, the girl pulled her pants back up and asked, "that good?"

- OCE – I won't share it with anyone
- OCE – Do you talk to him in a group or just one on one
- John4954 – in the group but one on one recently
  ***

- John4954 – ikr. He'll be sending me more. Says he's going to be doing picture sets like me and ▮ too
- John4954 – quess his wife and her play too
- John4954 – it's more common then what most people think
- OCE – Damn that's really sexy
- OCE – Does he sound like a trust worthy guy?
- John4954 – yeah he showed proof

59. Also on December 13, 2024, "john4954" and the OCE discussed how to avoid detection online as well as avoid individuals finding the devices used to create and distribute CSAM. The following is an excerpt of the conversation:

- John4954 – a vpn and a couple of masks is what you need to stay safe in this world
- OCE – Oooo I didn't even think of a vpn. You use one?
- John4954 – yup
- OCE – Smart
- OCE – Even tho you keep that phone at work?
- John4954 – definitely chicka
- John4954 – yup
- OCE – I didn't even think of that
- John4954 – they are cheap and untraceable
- John4954 – I suggest you get one asap
- OCE – Okay I'll look into it
- OCE – Do you only turn it on when you're doing something like this or all the time?
- John4954 – all the time
- OCE – Oh nice. So why can't you take this phone home with you?
- John4954 – the usually allow up to three devices. Don't want the wife to ever find it

60. Between November 13 through December 16, 2024, Telegram user "john4954" sent the OCE four videos that depicted CSAM. One video, approximately 12 minutes 30 seconds in length, began with a young pubescent girl wearing a white shirt and nude from the waist down, with an adult male inserting his penis into the girl's mouth and using his right hand to masturbate the girl's nude vagina. The girl appeared to be looking at a phone she was holding. At

approximately 1 minute 35 seconds, the video cut to a fully nude young pubescent girl sitting on a chair and masturbating. The girl continued to masturbate and began urinating. At approximately 3 minutes 10 seconds, the video cut to a young pubescent girl wearing a black strap outfit with breasts and vagina exposed, a black mask and a black gag in her mouth, and her wrists chained to her ankles. An adult male pulled the gag away to insert his fingers in her mouth, put the gag back in, and began to rub his penis on the girl's vagina before inserting it into her vagina and continued to perform vaginal sex on the girl in various positions. At 10 minutes 30 seconds, the video cut to a young pubescent girl wearing a light pink top and nude from the waist down, on her hands and knees facing away from the camera. An adult male stood over top of her and inserted his penis into the girl's anus and performed anal sex on the girl for approximately 1 minute. The male then picked up the camera and moved it closer to the girl's nude vagina and anus. The male then had the girl crawl on her hands and knees away from the camera while he continued to focus on her vagina and anus.

61. On or about December 30, 2024, FBI NVRA contacted your affiant and provided the information above, with which your affiant opened an investigation.

62. On January 10, 2025, an administrative subpoena was sent to AT&T for the phone number 740-343-3632, which was associated with the Telegram account "john4954." AT&T responded and provided the following information:

   - Name: Justin Lyons
   - Email: justinrlyons801@yahoo.com

63. Also on January 10, 2025, an administrative subpoena was sent to Yahoo for the email addresses justinrlyons801@yahoo.com and jlyons801@yahoo.com, the latter being the email associate with the Kik account "Cribby80." Yahoo was unable to provide records for the jlyons801@yahoo.com account, but provided the following for the justinrlyons801@yahoo.com account:

   - Name: Justin Lyons
   - Recovery Phone: 740-343-3632 – verified on October 10, 2022
   - IP Address: 65.60.178.131 – 11/06/2024 11:04:12UTC
   - IP Address: 65.60.240.244 – 11/27/2024 11:48:35UTC

64. Over the course of several days in January 2025, law enforcement surveilled Baker Welding at 2901 East 4th Ave, Suite 95, Columbus OH 43219 and observed LYONS arriving at the Baker Welding building and entering the building.

65. On February 13, 2025, your affiant executed a federal search warrant signed in the Southern District of Ohio to search the Baker Welding building, as well as for the person of Justin LYONS, and for electronic devices associated to LYONS. After being advised of the warrant and nature of the investigation, LYONS turned over a Samsung Galaxy Note 20 Ultra to your affiant.

66. Also on February 13, 2025, your affiant interviewed LYONS, and after being informed of his Miranda rights, agreed to talk to your affiant. LYONS informed your affiant that he used the Telegram application on the Samsung device your affiant seized to exchange CSAM to other individuals and groups and had been using it for more than a year. LYONS confirmed that he had been in communication with individuals who sent CSAM stating they were the ones in the videos performing the sex acts with the minor children. LYONS informed your affiant that there are additional messages still on Telegram related to these individuals.

67. During a manual review of the Samsung, your affiant identified the Telegram application, as well as CSAM in several of the group chats. Your affiant was reviewing the device on airplane mode, which prevented the device from accessing the internet and Telegram servers. Your affiant observed that the earliest chats were from on or around February 2, 2025, and displayed across the top of the chats was "Waiting for network…". Additionally, in the chats in which CSAM was found, there were additional images or videos that were blurred out or displayed with a loading wheel. Due to the phone being disconnected from the network, many of the image and video files, as well as older chat messages, were no longer viewable. Your affiant identified the following information from the Telegram account (the **SUBJECT ACCOUNT**) that was logged into the device:

   - Display name: john
   - Account phone number: 740-343-3632
   - Username: @just3956

68. Based on my training, experience, and research regarding Telegram, I know the only way to obtain the full chat history and files being received and distributed is to access the Telegram server where the files are stored.

69. The Samsung device has been securely stored at the FBI office located at 425 West Nationwide Boulevard, Columbus, Ohio 43215. Accordingly, it is reasonable to believe that the data contained on the Samsung device at the time it was seized remains undisturbed on the phone. Additionally, your affiant performed a forensic image of the device before a manual review was conducted so that the integrity of the data on the device at the time it was seized would remain undisturbed on the forensic image of the device.

70. Your affiant believes that a remote access search of the **SUBJECT ACCOUNT** on Telegram servers is necessary in order to obtain complete communications and files exchanged between users regarding the receipt, distribution, possession, and access with intent to view child pornography.

## THE REMOTE ACCESS SEARCH TECHNIQUE

71. Based on my training, experience, and the investigation described above I have concluded that using a remote access search technique will help law enforcement access the **SUBJECT ACCOUNT** on Telegram servers. Accordingly, I request authority to use the remote access search technique, which will be deployed via electronic communications, to search the **SUBJECT ACCOUNT**. This remote access search technique will consist of one of the following actions by law enforcement and forensic expert, to access the **SUBJECT ACCOUNT**, which may include a limited search of the Samsung device: (1) using tokens and encryption keys already extracted from or stored on the Samsung device and lawfully in possession of law enforcement (collectively, the "Credentials") to enter those Credentials into Telegram's online webpage or desktop application in order to access the **SUBJECT ACCOUNT**, or (2) powering on the Samsung device, enabling its internet connection in order to access the **SUBJECT ACCOUNT** through the Telegram application on the Samsung device, and using the Telegram application to login to the **SUBJECT ACCOUNT** on Telegram's online webpage. If law enforcement accesses the **SUBJECT ACCOUNT** using the online webpage or desktop application, they will extract the existing communications and other information from the **SUBJECT ACCOUNT**, and then exit the **SUBJECT ACCOUNT**. If law enforcement accesses the **SUBJECT ACCOUNT** by powering on the Samsung device and enabling its internet connection and is unable to login to the **SUBJECT ACCOUNT** using Telegram's online webpage, they will conduct a manual search of the Telegram application and then re-extract the Samsung device. After the search is completed,

law enforcement will disconnect the Samsung device from the internet. Law enforcement will not re-access the **SUBJECT ACCOUNT** once this remote access search technique has been fully completed without seeking further legal process from the Court, if necessary.

## COMMON CHARACTERISTICS OF INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

72. Based on my own knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in communicating about and engaging in sexual abuse of children:

- Those who communicate about and engage in sexual abuse of children and exchange or collect child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature and communications about such activity.

- Those who communicate about and engage in sexual abuse of children and trade or collect child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, video tapes, books, slides and/or drawings or other visual media, including digital files. Child pornography collectors oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

- Those who communicate about and engage in sexual abuse of children and trade or collect child pornography sometimes maintain any "hard copies" of child pornographic material that may exist that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. These child pornography collections and communications are often maintained for several years and are kept close by, usually at the collector's residence. In some recent cases, however, some people who have a sexual interest in children

have been found to download, view, then delete child pornography on a cyclical and repetitive basis, and to regularly delete any communications about the sexual abuse of children rather than storing such evidence on their computers or digital devices. Traces of such activity can often be found on such people's computers or digital devices, for months or even years after any downloaded files have been deleted.

- Those who communicate about and engage in sexual abuse of children and trade or collect child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

- When images and videos of child pornography or communications about sexual abuse of children are stored on computers and related digital media, forensic evidence of the downloading, saving, and storage of such evidence may remain on the computers or digital media for months or even years even after such images and videos have been deleted from the computers or digital media.

73. Based upon the conduct of individuals involved in creating, uploading, receiving, distributing, and/or collecting child pornography set forth in the above paragraphs, and the facts learned during the investigation in this case, namely that LYONS was engaged in the dissemination of child pornography to an FBI OCE over Telegram with a Telegram account that the investigation showed he was the owner of. Additionally, LYONS admitted to the OCE when asked what his age preference was, responded "13+", and told the OCE he was in a group that, in order to be a part of it, the members all must actively distribute media of themselves sexually abusing minors. Furthermore, LYONS admitted to your affiant that his Telegram account on the Samsung device seized from LYONS contained chats and media regarding child exploitation, which your affiant was able to confirm during a review of the device. Therefore, your affiant has reason to believe that LYONS has a sexual interest in minors and has created, viewed, or sought out visual depictions of minors engaged in sexually explicit conduct utilizing an internet-capable device. Your affiant therefore submits that there is probable cause to believe the evidence of the offenses of 18 U.S.C. §§ 2251, 2252, and 2252A – sexual

exploitation of a minor, advertising/solicitation for/or, and distribution and receipt of visual depictions of minors engaged in sexually explicit conduct (hereinafter "child pornography"), distribution, transmission, receipt, and/or possession of child pornography, will be located on the **SUBJECT ACCOUNT.**

## CONCLUSION

74. Based on the aforementioned factual information, your affiant submits there is probable cause to believe that violations of Title 18, United States Code, Sections 2251, 2252, and 2252A have been committed, and evidence of those violations is located in the content of the **SUBJECT ACCOUNT** described in **Attachment A**. Your affiant respectfully requests that the Court issue a search warrant authorizing the search and seizure of the items described in **Attachment B**.

Josh Saltar
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 3rd day of March, 2025.

Elizabeth Preston Deavers
United States Magistrate Judge
United States District Court
Southern District of Ohio

## ATTACHMENT A
## ITEM TO BE SEARCHED

(1) The portion of Telegram servers that stores communications and other information in the account registered to "@just3956" with a display name of "john," phone number 740-343-3632.

(2) Samsung Galaxy Note 20 Ultra cellular telephone, IMEI: 356556770559871, which is in the custody of the FBI located at 425 West Nationwide Boulevard, Columbus, Ohio 43215.

**ATTACHMENT B**
**LIST OF ITEMS TO BE SEIZED**

The following materials which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of violations of 18 U.S.C. §§ 2251, 2252, and 2252A, – sexual exploitation of a minor, advertising/solicitation for/or, and distribution and receipt of visual depictions of minors engaged in sexually explicit conduct (hereinafter "child pornography"), distribution, transmission, receipt, and/or possession of child pornography:

1. All files, documents, communications, images, videos, logs, and contacts associated with the Telegram account @just3956 related to visual depictions of minors engaging in sexually explicit conduct, child pornography, or child erotica;

2. Records identifying the users of the account described in Attachment A;

3. Records of names, phone contacts, phone numbers, phone call lists, incoming calls, outgoing calls, missed calls;

4. Messages, including chat messages, secret chats messages, and group messages or recorded voice messages, which may reflect communications with co-conspirators and/or victims, along with any evidence that would tend to show the true identities of the persons committing these offenses or the identifiers of the persons depicted in the images, videos, or other files.

5. GPS location information, maps, saved points, and any other information identifying or describing the location of the user of the device described in Attachment A.

6. Evidence of who used, owned, or controlled the account described in Attachment A at the time the things described in this warrant were created, edited or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, user profiles, messages and message logs, photographs, and correspondence.

7. Evidence of the time the account described in Attachment A was used;

8. Passwords, encrypted keys, and other access devices that may be necessary to access the account described in Attachment A;

9. Documentation and manuals that may be necessary to access the account described in Attachment A or to conduct a forensic examination of the account;

10. Contextual information necessary to understand the evidence described in this attachment.